## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 14-CIV-20840-BLOOM/Valle

HECTOR SANTANA, as
Personal Representative of the
Estate of Michael Santana,

      Plaintiff,

vs.

MIAMI-DADE COUNTY and
GERMAN ALECH,

      Defendant.

_____/

### ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court upon the Motion for Summary Judgment, ECF No.
[52] (the "Motion"), filed by Defendants Miami-Dade County (the "County") and Miami-Dade
police officer German Alech (together, "Defendants"). The Court has reviewed the Motion, all
supporting and opposing filings and submissions, and the record in the case. For the reasons that
follow, Defendants' Motion for Summary Judgment is **GRANTED**.

### I.      PROCEDURAL BACKGROUND

Plaintiff Hector Santana ("Plaintiff"), as representative of the Estate of Michael Santana
("Santana"), initiated this action on March 5, 2014 against Defendants alleging civil rights
violations and wrongful death and battery claims in connection with the death of his son. ECF
No. [1]. In response to the County's motion to dismiss, Plaintiff amended his original complaint
of right on April 18, 2014. ECF No. [13] ("First Amended Complaint"). On June 18, 2014, the
Court denied the County's motion to dismiss the wrongful death count asserted against it in the
First Amended Complaint. ECF No. [24]. On January 30, 2015, Plaintiff sought leave of the

Court to amend his First Amended Complaint to state a claim for negligence against the County. ECF No. [35]. The Court granted Plaintiff leave to amend, finding that Plaintiff's recent receipt of discovery materials substantiating a new claim demonstrated good cause as required under Fed. R. Civ. P. 16. ECF No. [37]. Plaintiff filed his Second Amended Complaint, ECF No. [38], on February 20, 2015. On April 27, 2015, the Court denied the County's motion to dismiss the wrongful death and negligence claims stated in the Second Amended Complaint. ECF No. [48].

Plaintiff's Second Amended Complaint, the operative pleading here, asserts four claims against the Defendants: wrongful death based on tortious battery against the County (Count I); illegal entry and search in violation of the Fourth Amendment to the United States Constitution cognizable under 42 U.S.C. § 1983 against Alech (Count II); excessive use of force in violation of the Fourth Amendment to the United States Constitution cognizable under 42 U.S.C. § 1983 against Alech (Count III); and state law negligence against the County (Count IV). By the instant Motion, Defendants seek summary judgment in their favor on all four claims.

## II.    MATERIAL FACTS

This case involves the shooting death of Santana by officer Alech on March 7, 2012. In February and March, 2012, Santana was engaged in the sale of marijuana at 6915 Bottle Brush Drive, Miami Lakes, Florida (the "Property"). ECF No. [53] (Defendants' Statement of Material Facts) ¶ 7; ECF No. [59] (Plaintiff's Counter-Statement and Statement of Material Facts) ¶ 7 (denying that Santana "was engaged in sales of narcotics" because he was motivated only by the ability to smoke marijuana for free); ECF No. [53-9] (Retkofsky Dep. Tr.) at 38:18-41:5 (Santana sold drugs out of the property but did not make a profit doing so).

The Property was purchased in the name of Kelly Santana, Santana's sister-in-law, in November, 2006. Def. St. Facts. ¶ 1; Pl. Cntr.-St. Facts ¶ 1. Kelly Santana and her husband

ceased making mortgage payments in February, 2008, and foreclosure proceedings with respect to the Property began in June, 2008. *Ids*. ¶ 2. On April 14, 2009, the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida (the "Circuit Court") issued a final judgment of foreclosure concerning the Property. *Ids*. ¶ 3; ECF No. [53-5] (Final Judgment of Foreclosure). On January 12, 2012, a sale of the Property was held pursuant to the Circuit Court's foreclosure judgment; the certificate of sale was filed with the clerk of court on January 18, 2012. Def. St. Facts. ¶ 4; Pl. Cntr.-St. Facts ¶ 4; ECF No. [53-6] (Certificate of Sale). On January 30, 2012, the certificate of title for the January 18, 2012 sale of the Property to JPMorgan Chase N.A. ("JPMorgan") was filed with the clerk of court. Def. St. Facts. ¶ 5; Pl. Cntr.-St. Facts ¶ 5; ECF No. [53-8 (Certificate of Title). On May 29, 2012, JPMorgan filed for a writ of possession, which it obtained from the Circuit Court on July 19, 2012. Pl. Cntr.-St. Facts ¶ 6; ECF No. [62-5] (foreclosure action docket sheet). The parties dispute whether and, if so, when Santana was a *bona fide* lessee of the Property.

Individuals purchasing narcotics from Santana at the Property would typically come through the front door or garage and leave shortly thereafter. Def. St. Facts. ¶ 8; Pl. Cntr.-St. Facts ¶ 8. Santana kept the narcotics either in a kitchen cabinet or in a box that he kept in the kitchen or in a bedroom. *Ids*. ¶ 9. While inside the residence, Santana always made it a point to keep a firearm either in a holster on his person or close by. *Ids*. ¶ 10; Retkofsky Dep. Tr. at 108:4-17.

On or around February 29, 2012, detective Louis Correa from the Miami-Dade Police Department's Narcotics Bureau received information from a confidential informant that marijuana was being sold and stored at the Property. Def. St. Facts. ¶ 16; Pl. Cntr.-St. Facts ¶ 16; ECF No. [53-12] (Correa Dep. Tr.) at 9:1-4. Thereafter, detective Correa observed what he

described as activity "conducive of street level sales" at the Property.  Correa Dep. Tr. at 9:7-13.

Later on February 29, 2012, detective Correa met with a confidential informant to conduct a

controlled purchase of marijuana from the Property.  Def. St. Facts. ¶ 18; Pl. Cntr.-St. Facts ¶ 18;

ECF No. [53-14] (Affidavit for Search Warrant, with detective Correa as affiant).  Detective

Correa prepared, directed and observed the controlled purchase; the confidential informant

purchased ten grams of marijuana from a male subject inside the Property.  Def. St. Facts. ¶ 19-

22; Pl. Cntr.-St. Facts ¶ 19-22; Affidavit for Search Warrant.

The next day, on March 1, 2012, detective Correa submitted a request for the Miami-

Dade Police Department's Special Response Team ("SRT") to assist in executing a search

warrant at the Property on March 7, 2012 at approximately 7:00 p.m.  Def. St. Facts. ¶ 24; Pl.

Cntr.-St. Facts ¶ 24; ECF No. [53-15] (Search Warrant Information Sheet).  The SRT is an elite

tactical unit within the police department that is utilized for, among other things, the execution of

high risk search warrants, barricaded subjects, hostage rescues, counter-terrorism operations, and

dignitary protection.  Def. St. Facts. ¶ 24; Pl. Cntr.-St. Facts ¶ 24; ECF No. [53-16] (Smith Dep.

Tr.) at 10:11-12:13.  The SRT commander determined that the warrant met the criteria for SRT

involvement, and execution of the search warrant was assigned to SRT team leaders, sergeant

Luis Sierra and sergeant Mauricio Smith.  Def. St. Facts. ¶ 27-28; Pl. Cntr.-St. Facts ¶ 27-28;

Smith Dep. Tr. 13-23-25; 15:13-16:7; 23:17-19; Search Warrant Information Sheet.

On March 5, 2012, detective Correa again met with the confidential informant and

conducted a second controlled purchase of marijuana as the Property.  Def. St. Facts. ¶ 29; Pl.

Cntr.-St. Facts ¶ 29; Affidavit for Search Warrant.  The same procedures were followed and the

same controlled purchase observed.  *Ids*. ¶¶ 30-33.  Detective Correa testified that, after this

second controlled purchase, the confidential informant advised him that the subject inside the

property carried a firearm on his person. Correa Dep. Tr. at 21:24-22:20; 34:4-17; 34:24-35:2. Information that the subject was armed is not included in the Affidavit for Search Warrant, Search Warrant Information Sheet, or in a supplemental "CI" report prepared by detective Correa on March 6, 2012. Pl. Cntr.-Stat. Facts ¶ 34; Def. Stat. Facts ¶ 49; Affidavit for Search Warrant; Search Warrant Information Sheet; ECF No. [62-11] (Supplemental CI Report).

On March 6, 2012, in preparation for executing the prospective search warrant, the SRT commander (lieutenant James) and two SRT team leaders (sergeants Smith and Sierra) conducted initial drive-bys of the Property to ensure consistency with detective Correa's report and to identify points of entry. Def. St. Facts. ¶ 35-39; Pl. Cntr.-St. Facts ¶ 35-39. With the go-ahead from SRT, on March 7, 2012, detective Correa appeared before state court Judge Migna Sanchez-Llorens, who issued a search warrant for the Property. Def. St. Facts. ¶ 39-40; Pl. Cntr.-St. Facts ¶ 39-40; ECF No. [59-13] (Search Warrant). SRT team leader sergeant Smith prepared a tactical plan to execute the search warrant. Def. St. Facts. ¶ 42-43; Pl. Cntr.-St. Facts ¶ 42-43. At approximately 7:00 p.m. on March 7, 2012, all County police personnel associated with execution of the search warrant arrived as planned at a staging location. Def. St. Facts. ¶ 41, 44-46; Pl. Cntr.-St. Facts ¶ 41, 44-46. County police personnel conducted a final drive-by at 7:40 p.m. *Ids.* ¶ 47. After that final drive-by and at approximately 8:00 p.m., SRT and police narcotics officers held a briefing, where personnel were given their assignments. *Ids.* ¶ 50, 52. Officer Alech, a member of the SRT unit, was assigned as the shield operator. *Ids.* ¶ 53.

Sergeant Smith, the SRT team leader, testified that during the final drive by, detective Correa informed him that the subject inside the property was known to carry a firearm – and specifically, a handgun – on his person at all times. Smith Dep. Tr. at 66:10-68:10; 71:14-72:7. Sergeant Smith and officers Alech and Garcia (another member of the SRT unit) all testified that

the fact that the subject at the Property was always armed with a gun was discussed at the 8:00 p.m. pre-execution briefing.  Smith Dep. Tr. at 82:7-10; ECF No. [53-20] (Garcia Dep. Tr.) at 36:1-4, 38:7-12; ECF No. [53-23] (Alech Dep. Tr.) at 49:13-15; 53:18-54:19; 59:8-13.  Santana, while inside the Property, did, in fact, make it a point to always keep a loaded handgun within reach.  Retkofsky Dep. Tr. at 108:15-1, 109:14-17.

The SRT team members arrived at the Property to execute the search warrant at approximately 8:20 p.m. on March 7, 2012.  Def. St. Facts. ¶ 61; Pl. Cntr.-St. Facts ¶ 61.  The SRT team arrived in two military-style vehicles.  Def. St. Facts. ¶ 60; Pl. Stat. Facts ¶ 2; Driveway Video.  The SRT officers were wearing green or black uniforms and protective gear which included prominently displayed police insignia and logos.  ECF No. [66] (four video recordings of the encounter:  Front Door Video, Front Walkway Video, Driveway Video and Living Room Video); Retkofsky Dep. Tr. at 94:21-95:12, 114:17-115:4; Garcia Dep. Tr. at 38:14-39:23.  Officer Alech was equipped with a black bulletproof shield that contained white block lettering that read "POLICE."  Def. St. Facts. ¶ 55; Pl. Cntr.-St. Facts ¶ 55.  Officer Alech was also wearing a ballistic helmet and his police-department issued uniform, which contained visible lettering on the chest and right and left shoulder area that read "POLICE."  *Ids*. ¶ 56.

Santana and his girlfriend, Brittany Retkofsky, were inside the residence when the SRT unit approached the residence.  Pl. Stat. Facts ¶ 23; Living Room Video.  The parties dispute whether, upon approaching the front door, the members of the entry team announced their presence as police officers effecting a search warrant.[1]  Eight members of the SRT unit

---

[1] Several officers testified that various members of the SRT team announced their presence and purpose in executing a search warrant as they approached the door.  Garcia Dep. Tr. at 44:22-45:1; Smith Dep. Tr. at 112:15-16, 119:2-3.  Plaintiff disputes this, stating that "none of the officers yelled or shouted prior to the door being forced open."  Pl. Stat. Facts, Resp. ¶ 63.  Neither Retkofsky or Santana's neighbor, Rolando Valdez, heard the officers announce their presence prior to breaking through the front door.  Retkofsky Dep. Tr. at 84; ECF No. [62-16] (Valdez Dep. Tr.) at 16-18.  The video evidence appears to conclusively demonstrate that the officers did *not*

approached the front door to execute the search warrant.  Front Door Video; Front Walkway Video.  Discovering the front door locked, the SRT team determined, in between one to two seconds, to breach the door forcibly.  Def. St. Facts. ¶¶ 64-66; Pl. Cntr.-St. Facts ¶¶ 64-66; Front Door Video.  Team members set a halligan bar – a pry tool – in between the front door and the doorframe by striking a sledgehammer against the door.  Def. St. Facts. ¶ 67; Pl. Cntr.-St. Facts ¶ 67.  The halligan bar was used to breach, or forcibly open, the front door.  *Ids*. ¶ 69.  Officer Alech was the first member of the SRT team to enter the residence.  *Ids*. ¶ 71.  Upon entering the residence, the officers shouted commands for the occupants to get down on their knees.  Retkofsky Dep. Tr. at 96:23-97:12.  Retkofsky complied; Santana did not.  *Id*.

Upon entry into the residence, officer Alech encountered a running wall directly in front of him as he proceeded left down the hallway created by the front entrance and the running wall.  Def. St. Facts. ¶ 72; Pl. Cntr.-St. Facts ¶ 72.  Other members of the SRT team proceeded to the right.  *Ids*. ¶ 73.  While proceeding left down the hallway, officer Alech saw an opening to his right side.  *Ids*. ¶ 76.  Officer Alech saw Santana run into that open space with a firearm in his right hand.  *Ids*. ¶ 77.  Officer Alech momentarily lost sight of Santana as Santana passed by the open space and went behind a nearby wall.  *Ids*. ¶ 79.  When officer Alech regained sight of Santana, Santana was in a crouched position with his right side towards a nearby wall and his firearm still in his hand.  *Ids*. ¶ 80.  The firearm in Santana's hand was pointed in officer Alech's direction.  *Ids*. ¶ 81.  With Santana pointing the firearm in officer Alech's direction, officer Alech, using loud verbal commands, directed Santana to drop the gun.  *Ids*. ¶ 82; Alech Dep. Tr. at 133:15-17.  Officer Alech provided these commands multiple times.  *Ids*. ¶ 84.  Officer Alech discharged his weapon three times.  *Ids*. ¶ 88.  Santana was shot and killed.  Def. Stat. Facts ¶ 38.

_____

announce their presence during the one to two seconds of their approach to the door, setting the halligan bar and breaching the entrance.  Front Door Video; Front Walkway Video.

Officer Alech testified that Santana – while pointing his firearm in officer Alech's direction such that had Santana fired his weapon it would have hit Alech – refused to comply with the repeated commands to drop his firearm.  Alech Dep. Tr. at 131:24-132:25.  He further testified that, prior to discharging his weapon, he saw Santana still holding his firearm.  *Id*. at 103:12-14, 132:20-22, 133:9-13, 138:7-9.  Officer Alech testified that he feared for his life.  *Id*. at 132:6-7.  Retkofsky testified that Santana did not comply with the officers' initial and multiple commands.  Retkofsky Dep. Tr. at 97:13-105:3.  However, she testified that, thereafter, Santana said "okay, okay, okay," "went to surrender," separated his hands, and put "his hands . . . up as he was on his way down."  *Id*.  She testified that she did not hear the gunshots and that she was unsure whether Santana put down the gun before or after he was shot.  *Id*.  Retkofsky further testified that from her vantage point she could not see officer Alech and that she had an obstructed view of Santana when he was confronted by officer Alech.  *Id*. at 92:2-17, 102:15-17.

The entire encounter – from when the SRT team entered the residence until Santana was shot and killed – took between six and ten seconds.  Front Door Video; Living Room Video.

### III.   SUMMARY JUDGMENT STANDARD

A party may obtain summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The parties may support their positions by citation to the record, including *inter alia*, depositions, documents, affidavits, or declarations.  Fed. R. Civ. P. 56(c).  An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party."  *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).  A fact is material if it "might affect the outcome of the suit under the governing law."  *Id.* (quoting *Anderson*, 477 U.S.

at 247-48).  The Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in its favor.  *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006); *Howard v. Steris Corp.*, 550 F. App'x 748, 750 (11th Cir. 2013) ("The court must view all evidence most favorably toward the nonmoving party, and all justifiable inferences are to be drawn in the nonmoving party's favor.").  However, material facts set forth in the movant's statement of facts and supported by record evidence are deemed admitted if not controverted by the opposing party.  S.D. FLA. L. R. 56.1(b).

"[T]he court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied."  *Carlin Commc'n, Inc. v. Southern Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986); *see also Aurich v. Sanchez*, 2011 WL 5838233, at *1 (S.D. Fla. Nov. 21, 2011) ("If a reasonable fact finder could draw more than one inference from the facts, and that inference creates an issue of material fact, then the court must not grant summary judgment." (citing *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913 (11th Cir. 1993)).  The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact.  *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008).  Once this burden is satisfied, "the nonmoving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'"  *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  Accordingly, the non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in his favor.  *Shiver*, 549 F.3d at 1343.  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could

reasonably find for that party." *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1162 (11th Cir. 2006). Even where an opposing party neglects to submit any alleged material facts in controversy, the court must still be satisfied that all the evidence on the record supports the uncontroverted material facts that the movant has proposed before granting summary judgment. *Reese v. Herbert*, 527 F.3d 1253, 1268-69, 1272 (11th Cir. 2008); *United States v. One Piece of Real Prop. Located at 5800 S.W. 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1103 n.6 (11th Cir. 2004).

## IV.  DISCUSSION

Disposition of this Motion and summary judgment in favor of Defendants ultimately turns on a simple set of facts which Plaintiff cannot dispute: that the officers knew Santana was armed before they breached the residence; and that Santana, despite being ordered multiple times to drop his firearm, took aim with that firearm at officer Alech (who was wearing tactical police gear and carrying a black bulletproof shield containing white block lettering that read "POLICE") before Alech shot him to death. Given that factual context, Alech is immunized from suit under section 1983, and Plaintiff's state law wrongful death by battery and negligence claims against the County fail.

### A.  Alech Is Entitled To Qualified Immunity With Respect To Both Section 1983 Claims (Counts II and III)

Defendants argue that Alech is entitled to qualified immunity with respect to Plaintiff's Fourth Amendment section 1983 claims for unlawful entry and excessive use of force, both because Plaintiff cannot establish any constitutional violations and because officer Alech had reasonable probable cause to undertake the complained of conduct. Defendants are correct.

#### 1.  Qualified Immunity In The Section 1983 Context

"Qualified immunity offers complete protection for government officials sued in their

individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Kingsland v. City of Miami*, 382 F. 3d 1220, 1231 (11th Cir. 2004) (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "This formulation of the qualified immunity inquiry is intended to protect government officials 'from undue interference with their duties and from potentially disabling threats of liability.'"  *Jordan v. Doe*, 38 F.3d 1559, 1565 (11th Cir. 1994) (quoting *Harlow*, 457 U.S. at 806); *see also Jackson v. Humphrey*, 776 F.3d 1232, 1241-42 (11th Cir. 2015) ("The purpose for qualified immunity is to permit officials to act without fear of harassing litigation as long as they can reasonably anticipate before they act whether their conduct will expose them to liability.").  The doctrine "'gives ample room for mistaken judgments' but does not protect 'the plainly incompetent or those who knowingly violate the law.'"  *Kingsland*, 382 F.3d at 1231-32 (quoting *Malley v. Briggs*, 475 U.S. 335, 343, 341 (1986)).  "Qualified immunity is an immunity from suit rather than a mere defense from liability."  *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007).

"To receive qualified immunity, 'the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Kingsland*, 382 F.3d at 1232 (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)); *see also O'Rourke v. Hayes*, 378 F.3d 1201, 1205 (11th Cir. 2004) ("To be even potentially eligible for qualified immunity, the official has the burden of establishing that he was acting within the scope of his discretionary authority.") (citation omitted).  Here, it is undisputed that officer Alech was acting in his discretionary capacity.  *See* 2d Am. Compl. ¶ 5.  Once a defendant raises the issue of qualified immunity and demonstrates that the acts complained of were committed within the scope of his discretionary authority, "the burden then shift[s] to the [plaintiff] to show that

qualified immunity should not apply because:  (1) the officers violated a constitutional right; and

(2) that right was clearly established at the time of the incident."  *Garczynski v. Bradshaw*, 573

F.3d 1158, 1166 (11th Cir. 2009).

"Additionally, the standard for determining if an officer violated clearly established law

is an objective one and does not include inquiry into the officer's subjective intent or beliefs."

*Jackson*, 206 F.3d at 1165 (citing *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir.1990).

"Thus, a police officer is entitled to qualified immunity if a reasonable police officer could have

believed his or her actions were lawful in light of clearly established law and the information

possessed by the officer at the time the conduct occurred."  *Id*. (citing *Stewart v. Baldwin County

Bd. of Educ.*, 908 F.2d 1499, 1503 (11th Cir. 1990)).

### 2.     Unlawful Entry

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures.'"  *Whittier v. Kobayashi*,

581 F.3d 1304, 1308 (11th Cir. 2009) (quoting U.S. Const. amend. IV).  In *Wilson v. Arkansas*,

514 U.S. 927, 929 (1995), the Supreme Court held that the Fourth Amendment's prohibition

against unreasonable searches and seizures incorporated the common law requirement that

officers, when executing a search warrant, must ordinarily announce their presence before

making a forcible entry into a home – the common-law "knock and announce" principle.  But the

Supreme Court has also recognized that "[t]he Fourth Amendment's flexible requirement of

reasonableness should not be read to mandate a rigid rule of announcement that ignores

countervailing law enforcement interests."  *Id.* at 934.  Specifically, the Supreme Court has held

that forcible entry without first knocking and announcing may be justified on a case by case basis

when officers "have a reasonable suspicion that knocking and announcing their presence, under

the particular circumstances, would be dangerous or futile, or that it would inhibit the effective

12

investigation of the crime by, for example, allowing the destruction of evidence." *Richards v. Wisconsin,* 520 U.S. 385, 394 (1997); *see United States v. Ramirez*, 523 U.S. 65, 71 (1998) (reiterating that a "no-knock entry is justified if police have a 'reasonable suspicion' that knocking and announcing would be dangerous, futile, or destructive to the purposes of the investigation."); *Kobayashi*, 581 F.3d at 1308 (describing *Richards* as prescribing a "case-by-case approach for determining if law enforcement acted reasonably in entering a residence without first knocking and announcing").  The officer must only establish "that one of these grounds for failing to knock and announce exists, and . . . 'this showing is not high.'" *Hudson v. Michigan*, 547 U.S. 586, 590 (2006) (quoting *Richards*, 520 U.S. at 394).

In the context of qualified immunity, the Eleventh Circuit has stated that "the issue is not whether reasonable suspicion existed in fact, but whether the officer had 'arguable' reasonable suspicion." *Jackson v. Sauls*, 206 F.3d 1156, 1166 (11th Cir. 2000).  "In other words, [the Court must] analyze whether a reasonable officer could have had reasonable suspicion that exigent circumstances, such as a threat of violence and/or destruction of evidence, existed to justify the no-knock entry." *Kobayashi*, 581 F.3d at 1308-09 (citing *Brent v. Ashley*, 247 F.3d 1294, 1303 (11th Cir. 2001)); *accord Case v. Eslinger*, 555 F.3d 1317, 1327 (11th Cir. 2009) ("Absent probable cause, an officer is still entitled to qualified immunity if arguable probable cause existed.").

> In undertaking the arguable reasonable suspicion inquiry, this Court must examine the totality of the circumstances to determine whether an officer had a "particularized and objective" basis to support his suspicion.  Whether the officer's suspicion ends up being mistaken is immaterial so long as it was reasonable.

*Kobayashi*, 581 F.3d at 1309 (citing *Brent*, 247 F.3d at 1303-04).

### a.      Satisfaction of the Knock and Announce Requirement

Plaintiff raises a genuine issue of fact as to whether the SRT officers announced their presence prior to entering the residence.  Various members of the SRT term testified that, as they approached the front door of the residence, they announced their police presence and their purpose in serving a search warrant.  Santana's girlfriend and neighbor both testified to not hearing any verbal announcement prior to the sounds of the officers' forced entry.  While Defendants view the video (which does not include audio) as depicting the officers' mouths moving, ostensibly announcing their presence, the video evidence appears to conclusively demonstrate that the officers did not announce their presence prior to breaching the door. Regardless, the Court cannot weigh conflicting witness accounts or make a factual assessment of the video evidence when considering summary judgment.  Ultimately, however, whether the officers knocked or announced their presence prior to breaching the residence is immaterial to the Court's adjudication of Defendants' Motion.

### b.      Exigent Circumstances Exception:  Destruction of Evidence

Again, where police, while serving a search warrant, "have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would . . . inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence," forced and unannounced entry does not violate the Fourth Amendment.  *Richards*, 520 U.S. at 394.  Defendants argue that the information obtained by detective Correa from his surveillance of the property and the two controlled purchases provided a reasonable basis to conclude that the drugs being sold were readily accessible and, therefore, easily disposable.  They highlight that the controlled purchases occurred, in their entirety, within no more than two to three minutes, and that surveillance of the location confirmed consistent drug transactions occurring within a brief period of time.  Defendants summarize the "activity at the property [as] consistent with a

'candy store' drug operation, where individuals would walk in and out of the location within a very brief period of time to purchase narcotics."  Mot. at 3.

However, Defendants offer no particularized, reasonable suspicion that immediate entry was needed *in this instance* to avoid the destruction of evidence that would inhibit the investigation of a crime.  Defendants, without any evidence particular to the facts and context of the case at bar, rely on a generalized assumption about the destructibility of drug-related evidence.  But there is nothing in the record here supporting Defendants' inference that quick drug transactions means easily disposable drugs.  If anything, quick sale turnaround implies high inventory volume and, therefore, too much narcotics evidence (and relatively bulky evidence at that, the drug at issue here being marijuana) to easily and quickly destroy while the police announce their presence.

Defendants' construction of the disposal of evidence exception to the knock and announce requirement would permit the government entry to any location containing any perishable evidence, or perhaps more generously, any location containing any destructible narcotics contraband – essentially, any location which could justify a search warrant in the first place – without first announcing its presence.  This is an exception that clearly swallows the rule. That construction would vitiate the Fourth Amendment's protection against unreasonable search and seizure, and the Court refuses to adopt it.  *See Kobayashi*, 581 F.3d at 1309 (explaining that *Richards* rejected "a blanket exception to the knock-and-announce requirement in felony drug cases" such that "the mere presence of contraband, without more, does not give rise to exigent circumstances").  *Compare United States v. Harris*, 713 F.2d 623, 626 (11th Cir. 1983) (no Fourth Amendment violation where there was *specific* evidence that the conspirators might act to conceal or destroy the drug evidence (cocaine) should they suspect police involvement).  *See*

*also Whitehurst v. Harris*, 2015 WL 71780, at *5 (N.D. Ala. Jan. 6, 2015) ("[L]aw enforcement must offer a *case-specific reason* for believing that announcing their presence would be dangerous, futile, or lead to destruction of evidence.") (emphasis added).

### c.    Exigent Circumstances Exception:  Danger

Defendants further argue that any reasonable officer in Alech's position would have had reasonable suspicion that exigent circumstances existed to breach the residence without the SRT team first announcing its presence because he and his police colleagues knew that Santana was armed prior to their entering the home.  This information, they contend, would lead an officer to reasonably suspect that announcement of a police presence could enable the subject in the residence to arm himself and take cover, thereby increasing the peril faced by the officers in executing the search warrant.  Indeed, the Eleventh Circuit has "repeatedly noted the dangerous, and often violent, combination of drugs and firearms."  *Kobayashi*, 581 F.3d at 1309 (citing *United States v. Hromada*, 49 F.3d 685, 689 (11th Cir. 1995) ("Guns and violence go hand-in-hand with illegal drug operations.")).

Here, detective Correa, sergeant Smith, officer Alech and officer Garcia testified that they were informed – prior to execution of the search warrant – that Santana was armed. Specifically, during the second controlled narcotics purchase, the confidential informant advised detective Correa that Santana carried a firearm on his person.  During the final drive by in preparation for execution of the search warrant, detective Correa informed sergeant Smith that Santana was known to carry a firearm on his person at all times.  That information was relayed to the SRT team – including officers Alech and Garcia – at the briefing later that evening.

Importantly, officer Alech, receiving information from the SRT team leaders and narcotics officers that Santana was armed and that the specific SRT tactics employed to effect the search warrant were proper, was entitled to rely on that information "and fill in any gaps in

the account with reasonable inferences premised on [those officers] acting in a constitutional manner and in good faith." *Wilkerson v. Seymour*, 736 F.3d 974, 980 (11th Cir. 2013); *see also Doran v. Eckold*, 409 F.3d 958, 965 (8th Cir. 2005) ("Section 1983 liability is personal. The question here is whether the conduct of [the individual officers] was constitutionally unreasonable. The answer to that question must take into account the settled principle that law enforcement officers may rely on information provided by others in the law enforcement community, so long as the reliance is reasonable.") (citing *United States v. Hensley*, 469 U.S. 221, 232 (1985); *Baker v. McCollan*, 443 U.S. 137, 145-46 (1979)).

Plaintiff argues that the absence of any documentation in the Affidavit for Search Warrant, Search Warrant Information Sheet, Supplemental CI Report, or other police records that Santana was armed constitutes evidence-by-omission that the police, in fact, had no information about Santana being armed before entering the residence. That evidence-by-omission, he continues, undermines the credibility of the officers' testimony that they knew Santana was armed prior to execution of the search warrant and creates a genuine issue of fact precluding summary judgment:

> The omission of the information about the gun in the warrant and the other police documents raises a jury question as to whether the police were in fact told such information. From the omission a jury could infer and conclude that the information was non-existent and that the police were not telling the truth. The scrutiny of the absence of information in a document *where it would normally be expected to be included* is a classic, time honored measure of veracity. Impeachment by omission is powerful evidence which juries routinely consider in weighing credibility.

Resp. at 8 (emphasis added).

However, Plaintiff presents no evidence that the information he characterizes as missing should have been there in the first place – that the documentation is absent, to use his words, "where it would normally be expected to be included." That is, Plaintiff points to no testimony,

evidence of standard police procedure, or expert opinion that the affidavit, reports, warrant information, and other police records which do not contain documentation of Santana being armed would normally include such information.  Without evidence justifying that expectation, Plaintiff's argument devolves into a bare attack on the officers' credibility.  Factual disputes cannot be created simply by challenging a witness' credibility.  *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998) (Once a defendant has moved for summary judgment, "the plaintiff may not respond simply with general attacks upon the defendant's credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden . . . ."); *Penley v. Eslinger*, 605 F.3d 843, 853 (11th Cir. 2010) (affirming summary judgment for officer in Fourth Amendment use of force context and rejecting plaintiff's attempt to "question [officer's] credibility [without] offer[ing] any evidence to contradict the[] material facts"); *Allen-Sherrod v. Henry Cnty. Sch. Dist.*, 248 F. App'x 145, 147-48 (11th Cir. 2007) (affirming summary judgment and holding that district court did not improperly assess or accredit witness credibility where plaintiff provided no record evidence to oppose witness testimony); *Fontanez v. Lamberti*, 2011 WL 4499016, at *2 (S.D. Fla. Sept. 27, 2011) (granting officers summary judgment in section 1983 context where plaintiff failed to provide affirmative evidence that defendants were lying about the subject's possession of a gun); *Nelson v. Associated Press, Inc.*, 667 F. Supp. 1468, 1476 (S.D. Fla. 1987) (finding summary judgment appropriate in the face of uncontroverted witness testimony); *cf.*, *e.g.*, *Combs v. Town of Davie*, 2007 WL 879426, at *5 (S.D. Fla. Mar. 20, 2007) (holding that genuine dispute of material fact precluded summary judgment where plaintiff "d[id] not simply make "broad, conclusory attacks" on the credibility of [the witness'] testimony; he provide[d] a video that documents at least part of the altercation and that seriously calls into question [the witness'] credibility").

Accordingly, there is no genuine dispute over whether the officers had knowledge of Santana being armed prior to executing the search warrant.  Armed with that knowledge and, consequently, the reasonable suspicion that knocking and announcing their presence would be dangerous, the SRT team and Alech did not violate the Fourth Amendment when they determined to enter the residence without first announcing their police presence.

Because Plaintiff cannot establish a constitutional violation, Alech is accorded immunity from suit on Plaintiff's section 1983 unlawful entry claim.

### 3.    Excessive Use Of Force

Plaintiff's claim that Alech used excessive force when he shot Santana is properly cognizable as a Fourth Amendment violation.  *Lenning v. Brantley Cnty., Ga.*, 579 F. App'x 727, 732 (11th Cir. 2014) ("When [the officer's] bullet struck him, plaintiff [] was seized within the meaning of the Constitution.") (citing *Carr v. Tatangelo*, 338 F.3d 1259, 1268 (11th Cir. 2003) ("Although [the plaintiff] was not immediately stopped by the bullet from [the officer's] gun, he nevertheless was seized within the meaning of the Fourth Amendment when the bullet struck or contacted him.").  "Fourth Amendment analysis of intentional physical control by police officers in § 1983 cases alleging excessive force, '[a]s in other Fourth Amendment contexts,' is subject to an objective reasonableness inquiry:  'the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'"  *Carr*, 338 F.3d at 1267 (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)); *see also Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002) ("The question is whether the officer's conduct is objectively reasonable in light of the facts confronting the officer."); *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (stating that "to determine whether the amount of force used by a police officer was proper, a court must ask

whether a reasonable officer would believe that this level of force is necessary in the situation at hand").

> Reasonableness is dependent on all the circumstances that are relevant to the officer's decision to use deadly force, including the seriousness of the crime, whether the suspect poses an immediate danger to the officer or others, whether the suspect resisted or attempted to evade arrest, and the feasibility of providing a warning before employing deadly force. *Penley v. Eslinger*, 605 F.3d 843, 850 (11th Cir. 2010). Perspective also is crucial to the analysis: "[t]he only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009).

*Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010). "[R]easonableness 'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight' and . . . 'must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving.'" *Ryburn v. Huff*, 132 S. Ct. 987, 992 (2012) (quoting *Graham*, 490 U.S. at 396-97)); *see also Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir.1993) (same). Accordingly, courts "are loath to second-guess the decisions made by police officers in the field." *Vaughan v. Cox*, 343 F.3d 1323, 1331 (11th Cir. 2003); *see also Buckley v. Haddock*, 292 F. App'x 791, 794 (11th Cir. 2008) ("We do not sit in judgment to determine whether an officer made the best or a good or even a bad decision . . . . The Court's task is only to determine whether an officer's conduct falls within the outside borders of what is reasonable in the constitutional sense."). In sum, "[r]egardless of whether probable cause actually existed, an officer is entitled to immunity if he 'reasonably could have believed that probable cause existed, in light of the information the officer possessed.'" *Garczynski*, 573 F.3d at 1167 (quoting *Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir. 1997)).

The undisputed facts here confirm the reasonableness of officer Alech's use of ultimately deadly force against Santana. Prior to entering the property, Alech had received information that

the subject, Santana, was engaged in the sale of narcotics, and that he was always armed.  Alech

wore a green uniform and black tactical gear, and carried a black bulletproof shield; the gear and

shield both prominently displayed the word "POLICE" in white letters on a black background.

Alech was the first member of the SRT team to enter the residence after the team used the

halligan bar to breach and forcibly open the front door.  According to Retkofsky, upon entering

the residence the officers shouted commands for the occupants to get down on their knees; she

complied, while Santana did not.  While other officers proceeded to the right along the running

wall facing the front door, Alech, followed by officer Garcia, proceeded left down the hallway

created by the front entrance and the running wall.  Alech saw an opening in the hallway to his

right.  He saw Santana run into that open space with a firearm in his right hand.  Alech ordered

Santana to drop the firearm.  Alech momentarily lost sight of Santana as he traversed the open

space and went behind a nearby wall.  When Alech regained sight of Santana, Santana was in a

crouched position, with his right side towards a nearby wall, and his firearm still in his hand.

Santana's firearm was pointed in officer Alech's direction.  With the gun pointed towards him,

Alech ordered Santana, several times and using loud verbal commands, to drop the firearm.

Santana did not comply with Alech's initial commands.

     Here, the parties' statements of the facts diverge.  Alech testified that Santana, while

continuing to point the gun in his direction, refused to comply with his repeated commands to

drop the firearm.  Santana never lowered or dropped the weapon.  Alech feared for his life.  He

then fired three shots at Santana.  Retkofsky, admitting that she had only a partial view of

Santana during the encounter, testified that while Santana refused to comply with the officer's

initial commands to put down his gun, he subsequently did begin to state his surrender, raise and

separate his hands, and drop his weapon.  That said, she testified further that she did not herself

hear the gunshots and that she was unsure whether Santana dropped his gun before or after he was shot – that is, as part of complying with the officer's command or as a result of, after not complying, having been shot.  The entire encounter between officer Alech and Santana occurred within a matter of seconds.

In effect, Plaintiff's case hangs on the implication from Retkofsky's testimony that Santana was in the process of surrendering when Alech shot and killed him.  Defendant characterizes Retkofsky's testimony as speculative based on the self-professed limitations on her personal knowledge.  She did not have a full view of Santana during the encounter, and cannot say, to contradict Alech's direct and unwavering testimony on the issue, that Santana moved to lower his gun in compliance with Alech's multiple commands before being shot. As such, the Defendant urges the Court to reject the inference based on speculation.  *See Marshall v. City of Cape Coral, Fla.*, 797 F.2d 1555, 1559 (11th Cir. 1986) ("All reasonable inferences arising from the evidence must be resolved in favor of the non-movant, but inferences based upon speculation are not reasonable."); *Morrison v. City of Atlanta*, --- F. App'x ---, 2015 WL 3561228, at *3 (11th Cir. June 9, 2015) ("Against [the of]ficer's specific testimony regarding when his involvement with [plaintiff] began, [plainitff's] conclusory and speculative assertion is insufficient to raise a genuine issue for trial.").  Here, even without discounting Retkofsky's testimony, Alech's conduct meets the objective reasonableness standard, articulated above, required for his use of force.

"[T]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect."  *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007).  Alech, wearing and carrying gear emblazoned with police lettering and logos, entered a known drug operation with knowledge that the subject was armed.  He saw

that subject rush past with a gun in his hand.  Alech lost and then regained sight of the subject, who was still armed.  The subject pointed the gun in his direction.  Alech, shouting and using unequivocal language, commanded Santana to drop his gun – more than once.  Santana did not comply with those commands.  He continued to point the gun in officer Alech's direction.  Alech made a split-second decision to deploy his weapon.  Whether or not Santana then (or, in all practicality, contemporaneously) decided and moved to comply, it was "constitutionally reasonable for [Alech] to use deadly force" under those conditions.  *See Robinson v. Arrugueta*, 415 F.3d 1252, 1256 (11th Cir. 2005); *Jean-Baptiste*, 627 F.3d at 821 ("Regardless of whether [plaintiff] had drawn his gun, [plaintiff]'s gun was available for ready use, and [the officer] was not required to wait 'and hope[] for the best.'") (quoting *Scott v. Harris*, 550 U.S. 372, 385 (2007)); *McCullough v. Antolini*, 559 F.3d 1201, 1208 (11th Cir. 2009) (no constitutional violation where officers used "deadly force in a split-second situation").  If Santana did in fact attempt to comply, tragically, that compliance came too late to give Alech any objectively reasonable cause to stay his weapon.

Because Alech's use of force was objectively reasonably under the conditions of his encounter with Santana, Plaintiff cannot establish a Fourth Amendment violation.  Alech, accordingly, is immune from suit.

### B.    Plaintiff Lacks Standing To Assert The Illegal Entry and Search Claim (Count II)

Defendants additionally argue that Plaintiff lacks standing to assert his Fourth Amendment claim for unlawful entry because Santana was a trespasser on the property under Florida law on the day of the encounter. As such, he had no reasonable expectation of privacy in the residence.  While moot by virtue of the Court's determination that Alech is entitled to

qualified immunity with respect to that claim, the undisputed facts here would require summary judgment for Alech on the standing issue as well.

The Eleventh Circuit has explained that because "the Fourth Amendment protects an individual in those places where she can demonstrate a reasonable expectation of privacy against government intrusion . . . only individuals who actually enjoy the reasonable expectation of privacy have standing to challenge the validity of a government search."  *United States v. Cooper*, 203 F.3d 1279, 1283-84 (11th Cir. 2000) (citing *Katz v. United States*, 389 U.S. 347, 353 (1967) and *Rakas v. Illinois*, 439 U.S. 128, 133-34, 143 (1978)).  Accordingly, "trespassers, squatters, and others who occupy premises without consent of the owner of the property do not have a reasonable expectation of privacy in that property for Fourth Amendment purposes [and consequently] lack standing to object to entry onto such premises . . . ."  *Christiansen v. City of Orlando*, 2012 WL 3025160, at *4 (M.D. Fla. July 24, 2012) (citing, *inter alia*, *United States v. Curlin*, 638 F.3d 562, 565 (7th Cir. 2011) (holding that "individuals who occupy a piece of property unlawfully have no claim under the Fourth Amendment," and collecting cases).

Here, the record evidence demonstrates conclusively that title to the property at 6915 Bottle Brush Drive had transferred from Kelly Santana, Santana's sister-in-law, to JPMorgan pursuant to a state court-ordered foreclosure sale in January, 2012. As such, Santana was trespassing on the property on March 7, 2012, when the SRT unit breached the premises. Plaintiff argues that Santana resided at the property pursuant to a *bona fide* lease agreement and, therefore, was entitled to protection under the Protecting Tenants at Foreclosure Act of 2009, 12 U.S.C. § 5220 *et seq.* ("PTFA"), which, in his argument, would have precluded JPMorgan from evicting Santana prior to the date in question.  Santana, the argument continues, had possessory rights in the property sufficient to provide Plaintiff standing to assert his Fourth Amendment

section 1983 claim.  However, the PTFA does not apply under the undisputed facts here.  The foreclosure action with respect to the property at issue here commenced on June 5, 2008.  The Circuit Court issued its final judgment of foreclosure on April 14, 2009.  The PTFA specifically states that it applies only "[i]n the case of any foreclosure on a federally-related mortgage loan or on any dwelling or residential real estate property after the date of enactment of this title . . ." PTFA § 702(a) (emphasis added).  The PFTA was enacted on May 20, 2009.  *See id.* Accordingly, the PTFA and its protections do not apply to the property or to Santana, regardless of whether he was a *bona fide* lessee in March, 2012.  The certificate of title for the January 18, 2012 foreclosure sale of the property was issued to JPMorgan on January 30, 2012.  Under Florida law, "[t]he purchaser at a foreclosure sale is entitled to possession of the premises from the time title vests in the purchaser."  *Neuschatz v. Rabin*, 760 So. 2d 1018, 1018 (Fla. 4th DCA 2000) (citing *Martorano v. Spicola*, 148 So. 585, 586 (Fla. 1933)).  As such, JPMorgan held valid title to the property as of January 30, 2012.  That JPMorgan later obtained a writ of possession in order, ostensibly, to remove any persons or property which unlawfully remained on the property is irrelevant to that legal fact.  Accordingly, Santana was trespassing on the property on March 7, 2012, stripping Plaintiff of standing to challenge the validity of Alech's entry onto the property.

**C.    Fla. Stat. § 776.085 Does Not Require Summary Judgment for the County on Plaintiff's State Law Claims (Counts I and IV)**

Plaintiff seeks to hold the County vicariously liable in tort for wrongful death by battery and for negligence based on the SRT officers' conduct on the day in question.  Under Florida law, "[i]t shall be a defense to any action for damages for personal injury or wrongful death . . . that such action arose from injury sustained by a participant during the commission or attempted commission of a forcible felony."  FLA. STAT. § 776.085.  A forcible felony is defined as

aggravated assault, aggravated battery, and "any other felony which involves the use or threat of physical force or violence against any individual."   FLA. STAT. § 776.08.   Finally, Fla. Stat. § 784.021 defines aggravated assault as "an assault with a deadly weapon without an intent to kill."   Accordingly, a plaintiff who "incurred his injuries while committing a forcible felony . . . is statutorily barred from recovering for personal injuries."   *Whittier v. City of Sunrise*, 395 F. App'x 648, 651 (11th Cir. 2010).   Defendants argue that Santana's conduct – arming himself with a firearm, pointing that firearm at officers who were in tactical police gear, and failing to lower his weapon when commanded multiple times to do so – constitutes a forcible felony barring Plaintiff's state law claims against the County.

Summary judgment is inappropriate on the factual record here.   Plaintiff contends that there is a material dispute of fact as to whether Santana knew the men who, within a matter of seconds, breached the residence and confronted him with guns drawn were, in fact, police officers.   The record is clear and undisputed that the members of the SRT team were fully outfitted with uniforms and tactical gear which prominently displayed the word "POLICE" in white letters on a black background.   They shouted to the residence's occupants, multiple times, to "get down" and to "put down the gun."   Retkofsky's view of the encounter was different than Santana's – for example, she could not see officer Alech from her vantage point when Santana was shot.   But, just like Santana, she heard the halligan bar break through the door and saw the same officers – wearing the same gear, carrying the same weapons and emblazoned with the same police identification and logos – rush the residence.   Yet, she testified that she did not know, at that time, that they were law enforcement officers who had entered the home:  "I had no idea at the moment.   It was so fast.   I thought maybe it was – we were being robbed or something, I had no idea."   Retkofsky Dep. at 107:1-3.   She only realized that the men were

26

police officers once she had been removed from the home and placed into a police car.  The video evidence – which illustrates the speed in which the officers breached the residence – reinforces Retkofsky's testimony.  Given that testimony, it is reasonable to infer that, in the brief chaos of the encounter, Santana was similarly unsure whether Alech was a law enforcement officer and not an unlawful home invader.  That is, it is reasonable to infer, based on the evidence presented here, that Santana did not intend to commit a forcible felony.  Because all reasonable inferences must be drawn in Plaintiff's favor, *see Davis*, 451 F.3d at 763; *Howard*, 550 F. App'x at 750, summary judgment in favor of the County is precluded on the basis of Fla. Stat. § 776.085.

Retkofksy's testimony and the confirmatory video evidence distinguish this case from *Whittier*.  There, the Eleventh Circuit affirmed the grant of summary judgment by the district court where it had concluded that the subject had "committed a forcible felony – aggravated assault – by raising the firearm and threatening the police officers with it."  *Whittier*, 395 F. App'x at 651.  As the panel explained:

> When the police officers, dressed in traditional SWAT gear that prominently displayed "POLICE" on the officers' chests, entered [plaintiff's] home and commanded that he get on the ground, [plaintiff] *instead ran through the house toward his bedroom*, where the officers knew [plaintiff] stored his firearms.  The officers *then kicked down the door* and entered [plaintiff's] bedroom, *again* yelling, "Police!"  Even assuming that the officers did not identify themselves before entering the house and that [the subject] could not tell that the men were police officers from their distinctive SWAT garb labeled "POLICE," [the subject] certainly knew the men were police officers when they screamed "Police!" within the close confines of [the subject's] bedroom.  Thus, [the subject's] decision to nevertheless raise and point his gun at the officers constituted not an act of self-defense, as [plaintiff] claims, but rather a forcible felony against the police officers.

*Id*. at 651-52 (emphasis added).  That is, in *Whiiter*, the plaintiff and the clearly identified officers engaged in a *prolonged* encounter, during which the plaintiff fled to defensive position in a different room where he kept weapons, and in which the plaintiff, retrieving his weapon after

first seeing the officers, and after the officers again identified themselves as police, decided to raise and point his gun at the officers.  By contrast, here, Retkofsky's testimony creates a reasonable inference that, given the speed and chaos of the four- to six-second encounter (speed and surprise being part of the intended effect of the SRT's entry tactics), Santana did not know that Alech and the other members of the SRT term were police officers when he raised and pointed his gun in their direction and refused to lower it in compliance with their directives.  Accordingly, the County cannot obtain summary judgment on the basis of Fla. Stat. § 776.085.[2]

### D. The County Is Due Summary Judgment on Plaintiff's Wrongful Death Claim (Count I)

Under Florida law, a wrongful death claim arises "[w]hen the death of a person is caused by the wrongful act, negligence, or breach of contract or warranty of any person . . . ."  FLA. STAT. § 768.19.  The "wrongful act" in Plaintiff's claim against the County is Alech's alleged battery against Santana.  *See* 2d Am. Compl. ¶¶ 51-55.  In order to establish a claim for battery, the plaintiff must demonstrate that the alleged tortfeasor acted in a manner "intending to cause a harmful or offensive contact with [another] person . . . and . . . an offensive contact with [that other] person . . . directly or indirectly result[ed]."  *City of Miami v. Sanders*, 672 So. 2d 46, 47 (Fla. 3d DCA 1996).  "A battery claim for excessive force is analyzed by focusing upon whether the amount of force used was reasonable under the circumstances."  *Id*.  Finally, "a 'presumption of good faith attaches to an officer's use of force in making a lawful arrest' [such that a] cause of action for excessive force will lie only where the 'force used is clearly excessive.'"

---

[2] The consistency of the Court's rulings on qualified immunity above and Fla. Stat. § 776.085 here underscores the space between an objective analysis of the reasonable officer's actions and determining intent to commit a forcible felony, even given the very same set of facts.  That officer Alech's use of force was objectively reasonable where he, knowing Santana was armed, seeing Santana was armed, confronted with Santana's aiming the gun in his direction, and with Santana refusing to comply with his multiple orders to lower his weapon, discharged his weapon, does not necessarily mean that Santana had to have known Alech was a police officer executing a valid search warrant when Santana threatened Alech with his weapon.

*Ruizdelatorre v. City of Miami Beach*, 2008 WL 5381431, at *14 (S.D. Fla. Dec. 22, 2008) (quoting *Sanders*, 672 So. 2d at 47).

As determined above, *see supra* § IV.A.3, Alech's use of force against Santana was objectively reasonable under the circumstances and not clearly excessive.   Accordingly, summary judgment must also be granted to the County on Plaintiff's claim for wrongful death by battery.

### E.    The County Is Due Summary Judgment on Plaintiff's Negligence Claim (Count IV)

Plaintiff claims that the County – via *respondeat superior* with respect to the supervising officers on the scene – was negligent in failing to adequately secure the perimeter of the residence and authorizing the use of the SRT unit in this instance to ultimately forcibly enter the home to execute the search warrant.  He alleges that the negligent "manner in which the SRT officers broke into and charged into the home was in violation of Miami Dade County Police policy and procedures."  2d Am. Compl. ¶ 69.  Plaintiff claims that that negligence caused Santana's fatal injuries.

As established above, *see supra* § IV.A.2.c, exigent circumstances warranted officer Alech's forced entry into the residence without first announcing a police presence such that the forced entry cannot substantiate a Fourth Amendment violation.  However, Plaintiff's common law negligence claim turns on a separate analysis.

"The elements of a negligence claim under Florida law are: (1) a legal duty on the defendant to protect the plaintiff from particular injuries; (2) the defendant's breach of that duty; (3) the plaintiff's injury being actually and proximately caused by the breach; and (4) the plaintiff suffering actual harm from the injury."  *Zivojinovich v. Barner*, 525 F.3d 1059, 1067 (11th Cir. 2008) (citing *Clay Elec. Coop., Inc. v. Johnson*, 873 So. 2d 1182, 1185 (Fla. 2003)).

"'[T]he enforcement of facially sufficient and validly issued arrest warrants are duties that law enforcement and the governmental entities associated with them owe to the general public and not to any individual person.'" *Eslinger v. Shields*, 91 So. 3d 185, 186 (Fla. 5th DCA 2012) (quoting *Willingham v. City of Orlando*, 929 So.2d 43, 50 (Fla. 5th DCA 2006)). "However, when an officer acts to enforce the law, Florida law has consistently recognized that a special relationship may arise between an officer and a tort victim when the officer's conduct creates a foreseeable zone of risk to a determinate individual or group." *Labance v. Dawsy*, 14 So. 3d 1256, 1259 (Fla. 5th DCA 2009) (citing *City of Pinellas Park v. Brown*, 604 So.2d 1222, 1226 (Fla. 1992) (officers conducting high-speed chase of motorist who ran red light had duty to reasonably safeguard surrounding motorists); *Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1263 (11th Cir. 2001) ("[R]eiterating Florida law, when a defendant, including a police officer, by his or her conduct creates a foreseeable zone of risk, the law imposes a duty owed by the defendant to *all* individuals within the zone to act with reasonable care.") (emphasis added); *Kaisner v. Kolb*, 543 So.2d 732, 734 (Fla. 1989) (officer who detained motorist pursuant to traffic stop had duty to reasonably safeguard the well-being of the detained motorist); *Brown v. Miami-Dade Cty.*, 837 So.2d 414, 417-18 (Fla. 3d DCA 2001) (when conducting sting operation in hotel, police had duty to reasonably protect safety of innocent bystanders); *City of Miami v. De La Cruz*, 784 So.2d 475, 478 (Fla. 3d DCA 2001) (when giving chase to criminal suspect in midst of crowded street festival, police had duty to reasonably safeguard surrounding revelers)). In terms of breaching that duty, "[i]n Florida, as elsewhere, negligence is defined as the failure to observe, for the protection of another's interest, such care and precaution as the circumstances demand, or the failure to do what a reasonable and prudent person would ordinarily have done under the circumstances." *Witt v. Norfe, Inc.*, 725 F.2d 1277, 1278 (11th Cir. 1984) (quotation

omitted); *Birge v. Charron*, 107 So. 3d 350, 361 (Fla. 2012) ("Under Florida law, negligence is the failure to use reasonable care under the circumstances."); *accord Wallace v. Dean*, 3 So. 3d 1035, 1041 n.9 (Fla. 2009) ("After a governmental policy or program has been adopted, it cannot be carried out with operational impunity and in a manner with total disregard to the injuries that it may inflict upon Floridians.").

Here, Plaintiff adequately states the existence of a special relationship based upon the officers' creation of a foreseeable zone of risk to the occupants of Santana's residence at the time of the execution of the search warrant.  As such, the operative question on summary judgment is whether the County has established the absence of any factual issue as to its vicarious breach of that duty.  More specifically, to succeed on summary judgment, the County must establish based on undisputed fact that its authorization and deployment of the SRT team to effect the search warrant on the Property did not breach their duty owed to those within the residence, including Santana – that it was reasonable under the circumstances.  In other words, the question is not simply whether the SRT unit executed the search warrant non-negligently, but whether use of the SRT unit – as Defendants state, "an elite tactical unit within the police department that is utilized for, among other things, the execution of *high risk search warrants*" (emphasis added) – and the tactics they employ was non-negligent (for example, proportionate to the threat faced and circumstances present) in the first place.

The undisputed evidence demonstrates that the SRT's commander first determined that the prospective search warrant for the Property met the criteria for SRT involvement *before* the confidential informant advised detective Correa that the subject at the Property was armed, and consequently *before* detective Correa relayed that information to anyone involved in planning execution of the search warrant.  Detective Correa submitted a request for SRT assistance after

the first controlled purchase but before the second controlled purchase. The confidential informant mentioned Santana being armed only during the second controlled purchase. Sergeant Smith testified that the primary reason for determining that SRT involvement was justified was police knowledge that the subject was armed: "Well, obviously, criteria one was that this individual was known to be armed and carry a weapon on him. . . . In this particular case, we had information that he was armed, or he is often armed. So, that alone values that parameter." Smith Dep. Tr. at 13:4-14:17. But detective Correa did not provide Smith or anyone else with that information until *after* the decision to involve the SRT was already made. This set of facts gives the Court pause. It appears that the County, through its police force, determined to use its elite, militarized, special response unit to effect a search warrant on what they describe as a well-functioning but low-level marijuana dispensary in a middle-income neighborhood without pointing to any specific reason – exigency, danger, etc. – to do so.

That said, by the time the police acted to effect the search warrant – after the second controlled purchase, after the SRT team leaders devised a tactical plan, after the multiple drive-bys and after the pre-execution briefing – all personnel involved had been informed that the subject inside the property, which was being operated as a "candy store" drug operation, was known to carry a gun on or near his person at all times. Therefore, the ultimate determination to deploy the SRT team and utilize the specific tactics employed to execute the search warrant was made with the police fully informed about the danger the armed subject inside the Property presented to them and anyone else involved. Defendants have submitted uniform testimony from the SRT commander and the SRT team leader, as well as from other officers involved, justifying the tactics deployed by the SRT team given the conditions present here – *inter alia*, a subject known to be armed at all times, a known drug operation, a high-volume of customers generating

significant foot traffic, and the configuration of the residence.  *See* Smith Dep. Tr. at 40:16-41:2 (operation complied and was consistent with standard operating procedures); 66:1-68:6 (subject was armed with handgun on person); 69:4-20 ("candy store" drug operation means significant foot traffic); 70:11-72:7 (subject was armed at all times); 94:14-96:8 (purpose of specific tactics employed was to gain quick control and "diminish risk of harm"); 124:24-125:23 (danger inside residence – armed suspect – justified speed of entry); 127:8-17 (armed subject and multiple window views from residence increased risk); ECF No. [62-18] (Herrera Dep. Tr. Vol. I) at 16:4-19:1, 20:1-23 (purpose of speed and stealth tactics to contain threat); ECF No. [62-19] (Herrera Dep. Tr. Vol. II) at 53:25-54:14 (all drug warrants are effectively high risk); Correa Dep. Tr. at 24:20-25:12 (informed all police personnel involved about armed subject).  Plaintiff has presented no contradictory evidence on this issue whatsoever in briefing the instant Motion. Rather, Plaintiff concedes that if exigent circumstances warranted the SRT unit's forced entry into the residence without first announcing their presence, a reasonable jury could not find the County negligent.  *See* ECF No. [60] (Plaintiff's "Response") at 20-21.

Based on the uncontroverted evidence here, the County's method of executing the search warrant was reasonable; the County did not breach its duty to protect those in the zone of danger created by that execution.  The County is due summary judgment on this count as well.

CASE NO. 14-CIV-20840-BLOOM/Valle

## V.   CONCLUSION

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** that Defendants'

Motion for Summary Judgment, ECF No. [52] is **GRANTED**.

The Clerk of Court is directed to **CLOSE** this case.  Any pending motions are **DENIED**

**as moot**.  Any impending deadlines are **TERMINATED**.

**DONE and ORDERED** in Miami, Florida, this 28th day of August, 2015.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:
Counsel of Record

34